FILED
**UNITED STATES DISTRICT COURT** CLERKS OFFICE
**FOR THE DISTRICT OF MASSACHUSETTS**

2006 JUN 12 P 2: 13

L.A. MURPHY, derivatively, in the right of an
for the benefit of, ANALOG DEVICES, INC.,

Plaintiff,

v.

JAMES A. CHAMPY, JOHN C. DOYLE, JERALD G. FISHMAN, SAMUEL H. FULLER, JOHN C. HODGSON, RUSSELL K. JOHNSEN, CHRISTINE KING, BRIAN P. McALOON, JOSEPH E. McDONOUGH, F. GRANT SAVIERS, PAUL J. SEVERINO, KENTON J. SICCHITANO, RAY STATA, LESTER C. THUROW,

Defendants,

and

ANALOG DEVICES, INC.,

Nominal Defendant.

U.S. DISTRICT COURT
RECEIPT # OF MASS
AMOUNT $
SUMMONS ISSUED
Civil Action LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
JURY TRIAL DEMANDED
DATE

**06-11019 DPW**

MAGISTRATE JUDGE

## VERIFIED DERIVATIVE ACTION COMPLAINT

Plaintiff, L.A. Murphy, for her derivative action complaint, based upon the investigation of her counsel, alleges as follows on information and belief:

## SUMMARY

1. This derivative action is brought in the right of, and for the benefit of nominal defendant Analog Devices, Inc., ("Analog," "Analog Devices," or the "Company"), against its President and Chief Executive Officer and certain executives and members of its Board of Directors, to remedy defendants' breaches of fiduciary duties and other violations of law which have caused damage to the Company.

2.      Defendant Jerald G. Fishman, the Company's President and Chief Executive Officer engaged in certain transactions, including the exercise of back-dated options, to reap hundreds of thousands of dollars in unlawful windfall profits at the expense of the Company.

3       A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price – referred to as the "exercise price" – for a specified period of time. Stock options are granted as part of employees' compensation packages to create incentives for them to boost profitability and stock value. When an employee exercises an option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised.

4       Options are required to be priced at the price of the Company stock on the day of the grant. If an option is back-dated to a day on which a market price was lower than the price on the day the option is granted, then the employee pays less to acquire the option and the company receives less money for the stock when the option is exercised by that employee. Furthermore, the purchaser of the option receives greater compensation than he is otherwise entitled to. Such conduct is unlawful.

5       On November 16, 2005, numerous news sources, including The Wall Street Journal reported that Analog and Mr. Fishman reached a "tentative settlement" with the Securities and Exchange Commission over a probe of stock-option pricing.

6       Analog Devices first disclosed in November 2004 that the SEC was looking into its option grants to executives, some of which came shortly before favorable financial results that lifted the stock price.

2

7       As part of the settlement, the Company paid a $3 million penalty and re-priced options granted to Mr. Fishman and other directors; Mr. Fishman also paid a $1 million penalty and unspecified disgorgement.

8       The unlawful conduct occurred while defendants were directing the Company. These defendants authorized or failed to halt the back-dating of options in dereliction of their fiduciary duties to the Company as directors, thus causing or allowing the Company to suffer hundreds of millions of dollars in harm.

9.      Back-dating the options violated Analog's stock option plan and Fishman's employment agreement. Back-dating the options also breached of defendants' fiduciary duties of care, loyalty, and good faith to Analog.

10.     Defendants' conduct has unjustly enriched Analog's top executives, including Defendant Fishman and exposed the Company to great expense and liability, to the detriment of Analog and its shareholders.

## PARTIES

11.     Plaintiff L A Murphy is a Florida resident and has owned at all times relevant to this action, and continues to own, the Company's common stock.

12.     As a current holder of Analog common stock and a continuous holder throughout the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, Plaintiff has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

## Management Defendants:

13.     Defendant Jerald G. Fishman ("Fishman") is President and Chief Executive Officer of the Company since November 1996 and a Director since 1991. He served as Executive

3

Vice President from 1988 to November 1991, and Group Vice President — Components from 1982 to 1988. Mr. Fishman also serves as a director of Xilinx, Inc.

14. Defendant Samuel H. Fuller ("Fuller") Vice President, Research and Development since March 1998.

15. Defendant Russell K. Johnsen ("Johnsen") was Vice President, Corporate Business Development since March 2001 to 2002; Vice President and General Manager, Communications Products May 1994 to March 2001; and Vice President and General Manager, Analog Devices Semiconductor Division from November 1993 to May 1994.

16. Defendant Brian P. McAloon ("McAloon") has been Vice President, DSP and Systems Products Group since March 2001; Vice President, Sales from May 1992 to March 2001; Vice President, Sales and Marketing — Europe and Southeast Asia from 1990 to 1992; and General Manager, Analog Devices, B.V. — Limerick, Ireland from 1987 to 1990.

17. Defendant Joseph E. McDonough ("McDonough") has been Vice President, Finance and Chief Financial Officer since November 1991; Vice President since 1988 and Treasurer from 1985 to March 1993; and Director of Taxes from 1983 to 1985.

18. Defendants Fishman, Fuller, Johnsen, McAloon and McDonough are sometimes hereinafter referred to as the "Management Defendants."

**Director Defendants:**

19. Defendant James A. Champy ("Champy") has been a director since March 2003 and has been a Vice President of Perot Systems Corporation, a technology services and business solutions company, since 1996. Mr. Champy also serves as a trustee of the Massachusetts Institute of Technology.

4

20.     John L. Doyle ("Doyle") has been a Director since 1987 and has been self-employed as a technical consultant since September 1991. He was employed formerly by the Hewlett-Packard Company, a provider of technology solutions, where he served as the Executive Vice President of Business Development from 1988 through 1991, Executive Vice President, Systems Technology Sector from 1986 to 1988, Executive Vice President, Information Systems and Networks from 1984 to 1986, and Vice President, Research and Development from 1981 to 1984. Mr. Doyle also serves as a director of Xilinx, Inc.

21.     John C. Hodgson ("Hodgson") has been a Director since September 2005 and has been Senior Vice President and Chief Customer Officer for DuPont since May 2005. Mr. Hodgson served as Chief Marketing and Sales Officer from February 2002 to May 2005 and Group Vice President and General Manager of DuPont iTechnologies from February 2000 to February 2002.

22.     Christine King ("King") has been a Director since June 2003 and has been President and Chief Executive Officer of AMI Semiconductor, Inc., a designer and manufacturer of customer specific integrated mixed signal semiconductor products, since September 2001. From September 2000 to September 2001, Ms. King served as Vice President of Semiconductor Products for IBM Microelectronics, a provider of semiconductor products and services, foundry expertise and standard processor components. From September 1998 to September 2000, Ms. King was Vice President of the Networking Technology Business Unit for IBM. Ms. King also served as Vice President of Marketing and Field Engineering at IBM from June 1995 to September 1998 and Manager of ASIC Products at IBM from March 1992 to June 1995. Ms. King also serves as a director of AMI Semiconductor, Inc.

23.     F. Grant Saviers ("Saviers") Director since 1997 and has been retired since August 1998. He served as Chairman of the Board of Adaptec, Inc., a provider of high-performance input/output products, from August 1997 to August 1998, President and Chief Executive Officer of Adaptec from July 1995 to August 1998, and President and Chief Operating Officer of Adaptec from August 1992 to July 1995. Prior to joining Adaptec, Mr. Saviers was employed with Digital Equipment Corporation, a computer manufacturer, for more than five years, last serving as Vice President of its Personal Computer and Peripherals Operation.

24.     Paul J. Severino ("Severino") has been a Director since November 2005 and an investment advisor to emerging technology companies and venture funds since 1996. From 1994 to 1996, he was Chairman of Bay Networks, Inc., a data networking products services company, after its formation from the merger of Wellfleet Communications, Inc. and Synoptics Communications, Inc. Prior to that, he was a founder, President and Chief Executive Officer of Wellfleet Communications, Inc. Mr. Severino is also a director of Sonus Networks, Inc.

25.     Kenton J. Sicchitano ("Sicchitano") has been a Director since March 2003 and has been retired since June 2001. He joined Price Waterhouse LLP, a predecessor firm of PricewaterhouseCoopers LLP, in 1970 and became a partner in 1979. PricewaterhouseCoopers LLP, or PwC, is a public accounting firm. At the time of his retirement, Mr. Sicchitano was the Global Managing Partner of Independence and Regulatory Matters for PwC. During his 31 year tenure with PwC, Mr. Sicchitano held various positions including the Global Managing Partner of Audit/Business Advisory Services and the Global Managing Partner responsible for Audit/Business Advisory, Tax/Legal and Financial Advisory Services. Mr. Sicchitano also serves as a director of PerkinElmer, Inc. and MetLife, Inc. Mr. Sicchitano is a certified public accountant.

6

25. Ray Stata ("Stata") is Chairman of the Board of Directors since 1973 and a Director since 1965. Mr. Stata served as the Company's Chief Executive Officer from 1973 to November 1996 and as the Company's President from 1971 to November 1991. Mr. Stata also serves as a trustee of the Massachusetts Institute of Technology.

27. Defendant Lester C. Thurow ("Thurow") has been a Director since 1988 and a Professor of Management and Economics at the Massachusetts Institute of Technology since 1968 and, from 1987 to 1993, was the Dean of MIT's Sloan School of Management. Mr. Thurow also serves as a director of Taiwan Semiconductor Manufacturing Company Limited.

28. Defendants Fishman, Champy, Doyle, Hodgson, King, Saviers, Severino, Sicchitano, Stata, and Thurow are sometimes collective referred to as the "Director Defendants."

**Nominal Defendant:**

29. Nominal Defendant Analog is a Massachusetts corporation and engages in the design, manufacture, and marketing of analog, mixed-signal, and digital signal processing integrated circuits. These integrated circuits are used in signal processing for industrial, communication, computer, and consumer applications. The Company's products converts temperature, motion, pressure, light, and sound into electrical signals to be used in various electronic equipment, such as industrial process control equipment, factory automation systems equipment, defense electronics, cellular communications, base stations, central office equipment, wireless telephones, computers, automobiles, CAT scanners, digital cameras, and DVD players. It sells its products worldwide through a direct sales force, third-party distributors, and independent sales representatives, as well as through Internet. The Company was founded in 1965 and is headquartered in Norwood, Massachusetts.

7

## JURISDICTION AND VENUE

3 ).     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise in part under the Constitution and the laws of the United States. This Court also has jurisdiction over this action in that Count I arises under the federal securities laws. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(a)(1) because one or more of Defendants either resides or maintains executives offices in this Judicial District, and a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District. Moreover, Defendants have received substantial compensation in this Judicial District by virtue of the Company's incorporation in the state of Delaware, doing business here and engaging in numerous activities that had an effect in this Judicial District.

## FACTS

32.     From 1998 to 2001 (the "Relevant Period") the Company had in place the 1998 Stock Option Plan (the "Plan"). The Plan made "[a]ll of the Company's employees, officer, directors, consultants and advisors" eligible to be granted options. Section 3(a) places the responsibility of administering the Plan on the Board of Directors the. It states as follows:

> The Plan will be administered by the Board of Directors of the Company (the "Board"). The Board shall have authority to grant Options and to adopt, amend and repeal such administrative rules, guidelines and practices relating to the Plan as it shall deem advisable. The Board may correct any defect, supply any omission

8

or reconcile any inconsistency in the Plan or any Option in the manner and to the extent it shall deem expedient to carry the Plan into effect and it shall be the sole and final judge of such expediency. All decisions by the Board shall be made in the Board's sole discretion and shall be final and binding on all persons having or claiming any interest in the Plan or in any Option. No director or person acting pursuant to the authority delegated by the Board shall be liable for any action or determination relating to or under the Plan made in good faith.

33. Section 5(c) of the Plan requires that the Board establish an exercise price in

accordarce with the following mandate:

> The Board shall establish the exercise price at the time each Option is granted and specify it in the applicable Option Agreement; provided, however, that **the exercise price shall be not less than 100% of the fair market value of the Common Stock**, as determined by the Board, **at the time of the Option grant** ("Fair Market Value"). (Emphasis added)

34. During the Relevant Period, the Company also in effect had the 1994 Director

Option Plan (the "Director Plan"). The Director Plan was for Directors of the Company who are

not employees of the Company.

35. Section 2 of the Director Plan states that "[t]he Board of Directors shall supervise

and administer the Plan." The Director Plan further requires that:

> "[t]he option exercise price per share for each option granted under the Plan shall equal (i) the last reported sales price per share of the Company's Common Stock, as listed on a nationally recognized securities exchange, on the date of grant (or, if no such price is reported on such date, such price as reported on the nearest preceding day); or (ii) the fair market value of the stock on the date of grant, as determined by the Board of Directors, if the Common Stock is not publicly traded."

36. Both plans required the Board of Directors to set the exercise price of the options

granted at no less than the fair market value on the date of the grant and/or, more specifically for

directors, at the last reported sales price of the Company's stock as listed on a nationally

recognized securities exchange.

9

**Defendant Fishman**

37.     From 1998 to 2001 Defendant Fishman received the following stock options

which the Company later admitted were back-dated:

   a.     On September 4, 1998, Defendant received 300,000 options at $13.25 per
          share.   Defendant and the Company subsequently admitted that the
          options grant actually took place on September 8, 1998; the price of the
          stock on that day was $14.75.  As a result of this back-dating, Defendant
          received a gain of $450,000 at the expense of the Company.

   b.     On November 30, 1999, Defendant received 600,000 options at $28.75 per
          share.   Defendant and the Company subsequently admitted that the
          options grant actually took place on November 29, 1999; the price of the
          stock on that day was $28.97.  As a result of this back-dating, Defendant
          received a gain of $132,000 at the expense of the Company.

   c.     On July 18, 2001, Defendant received 13,964 options at $39.06 per share.
          Defendant and the Company subsequently admitted that the options grant
          actually took place on July 26, 2001; the price of the stock on that day was
          $48.27.  As a result of this back-dating, Defendant received a gain of
          $128,608.44 at the expense of the Company.

**Defendant Fuller**

38.     From 1999 to 2001 Defendant Fuller received the following stock options which

the Company later admitted were back-dated:

   a.     On November 30, 1999, Defendant received 80,000 options at $28.75 per
          share.   Defendant and the Company subsequently admitted that the
          options grant actually took place on November 29, 1999; the price of the
          stock on that day was $28.97.  As a result of this back-dating, Defendant
          received a gain of $17,600 at the expense of the Company.

   b.     On July 18, 2001, Defendant received 5,431 options at $39.06 per share.
          Defendant and the Company subsequently admitted that the options grant
          actually took place on July 26, 2001; the price of the stock on that day was
          $48.27.  As a result of this back-dating, Defendant received a gain of
          $50,019.51 at the expense of the Company.

## Defendant Johnsen

3?.    From 1999 to 2001, Defendant Johnsen received the following stock options,

which th: Company later admitted were back-dated:

>   a.    On September 4, 1998, Defendant received 35,000 options at $13.25 per share.    Defendant and the Company subsequently admitted that the options grant actually took place on September 8, 1998; the price of the stock on that day was $14.75. As a result of this back-dating, Defendant received a gain of $52,500 at the expense of the Company.

>   b.    On July 18, 2001, Defendant received 4,875 options at $39.06 per share. Defendant and the Company subsequently admitted that the options grant actually took place on July 26, 2001; the price of the stock on that day was $48.27.  As a result of this back-dating, Defendant received a gain of $44,898.75 at the expense of the Company.

## Defendant McAloon

4?.    From 1998 to 2001, Defendant McAloon received the following stock options,

which th: Company later admitted were back-dated:

>   a.    On September 4, 1998, Defendant received 35,000 options at $13.25 per share.    Defendant and the Company subsequently admitted that the options grant actually took place on September 8, 1998; the price of the stock on that day was $14.75. As a result of this back-dating, Defendant received a gain of $52,500 at the expense of the Company.

>   b.    On November 30, 1999, Defendant received 110,000 options at $28.75 per share.    Defendant and the Company subsequently admitted that the options grant actually took place on November 29, 1999; the price of the stock on that day was $28.97. As a result of this back-dating, Defendant received a gain of $24,200 at the expense of the Company.

>   c.    On July 18, 2001, Defendant received 6,453 options at $39.06 per share. Defendant and the Company subsequently admitted that the options grant actually took place on July 26, 2001; the price of the stock on that day was $48.27.  As a result of this back-dating, Defendant received a gain of $59,432.13 at the expense of the Company.

**Defendant McDonough**

41. From 1998 to 2001, Defendant McDonough received the following stock options, which the Company later admitted were back-dated:

        a.    On September 4, 1998, Defendant received 35,000 options at $13.25 per share. Defendant and the Company subsequently admitted that the options grant actually took place on September 8, 1998; the price of the stock on that day was $14.75. As a result of this back-dating, Defendant received a gain of $52,500 at the expense of the Company.

        b.    On November 30, 1999, Defendant received 110,000 options at $28.75 per share. Defendant and the Company subsequently admitted that the options grant actually took place on November 29, 1999; the price of the stock on that day was $28.97. As a result of this back-dating, Defendant received a gain of $24,200 at the expense of the Company.

        c.    On July 18, 2001, Defendant received 6,052 options at $39.06 per share. Defendant and the Company subsequently admitted that the options grant actually took place on July 26, 2001; the price of the stock on that day was $48.27. As a result of this back-dating, Defendant received a gain of $55,738.92 at the expense of the Company.

42. Additionally, the Management Defendants received over 900,000 options on November 10, 2000 at a low of $44.50 per share. Just five days later on November 15, 2000 the stock rose nearly nineteen dollars to $63.25 per share. How convenient, especially considering that the stock price on November 9, 2000 was $45.88 per share, and that stock price on November 13, 2000, just one business day after November 10, 2000, was $48.19 per share.

**Defendant Stata**

43. From 1998 to 1999, Director Defendant Stata received the following stock options which the Company later admitted were back-dated:

        a.    On September 4, 1998, Defendant received 10,000 options at $13.25 per share. Defendant and the Company subsequently admitted that the options grant actually took place on September 8, 1998; the price of the stock on that day was $14.75. As a result of this back-dating, Defendant received a gain of $44,000 at the expense of the Company.

b.   On November 30, 1999, Defendant received 200,000 options at $28.75 per share. Defendant and the Company subsequently admitted that the options grant actually took place on November 29, 1999; the price of the stock on that day was $28.97. As a result of this back-dating, Defendant received a gain of $15,000 at the expense of the Company.

44.   The back-dating practices of Defendant Stata and the Management Defendants resulted in a gain of at least $1,203,197.75 to the detriment of the Company.

**The Consequences**

45.   On May 24, 2006, Analog Devices announced over the <u>Business Wire</u> that it was served with a document subpoena from the U.S. Attorney for the Southern District of New York "requesting records from 2000 to the present relating to the Company's granting of stock options." The Company stated [it] plans to cooperate fully with the office of the United States Attorney in connection with this subpoena."

46.   The press release further related that the subpoena concerned, in part, Mr. Fishman's previous settlement with the SEC:

> The Company believes that the options at issue in this matter are the same option grants which have been the subject of investigation by the SEC. As previously disclosed, the Company has reached a tentative settlement with the SEC regarding the SEC's inquiry into the Company's stock option granting practices. That settlement would conclude that, with respect to options granted to Company employees (including officers) and directors on November 10, 2000, the Company should have made disclosures in its proxy filings to the effect that the Company priced these stock options prior to releasing favorable financial results. Further, with respect to options granted to employees (including officers) and directors in 2001, the settlement would conclude that the appropriate grant date for options granted on July 18, 2001 should have been July 26, 2001 (which is five trading days after the original date). The Company is continuing to work with the SEC to finalize that settlement. The Company has determined that no restatement of its historical financial results would be necessary due to the proposed settlement, because the effects of using revised measurement dates for the options in

13

> question are not material to any of the Company's fiscal years,
> based on the materiality guidelines contained in SAB 99.

47.     The Board of Directors was responsible for overseeing the details of the Company's compensation and stock option plans. The Board of Directors was also responsible for negotiating and administering the Company's employment arrangement with the Management Defendants, supervising incentive compensation programs for the Company's employees, and reviewing and monitoring director compensation programs.

43.     In its public filings with the Securities and Exchange Commission and shareholder approved stock options plans, the Company represented that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for the Company stock, on the date of the grant.

49.     Defendants stood in a fiduciary relationship with the Company's shareholders and thereby owed them duties of due care and loyalty. These duties require the board of directors to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interest of the Company and its shareholders.

53.     Defendants violated their fiduciary duties to the Company by failing to act with due care, loyalty and good faith, when they either expressly authorized the practice of back-dating options, or in conscious abrogation of their fiduciary duties, permitted it to occur.

51.     Defendants misrepresented and caused the Company to misrepresent in public SEC filings that the stock options were priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The stock option plans and employment agreements, referenced above, were exhibits that were

14

incorpora ted by reference each year in the Company's Annual Reports on Form 10-K. Also, the Management Defendants' compensation, including their stock option grants, were disclosed in the Company's yearly proxy statements promulgated in connection with the Company's annual meetings Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder, prior to the publication of the November 16, 2005, Wall Street Journal article.

52. Defendants' breaches of their fiduciary duties have exposed the Company to a number of harms including: the expense of internal investigation; the expense of SEC investiga ions; the potential liability under tax laws and federal securities laws; the possibility of having to restate financial results; and liability to stock purchasers.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

53. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by the Company as a direct result of the breach of fiduciary duty, waste of corporate assets, and unjust enrichment, alleged herein. The Company is named as a nominal defendant solely in a derivative capacity.

54. Plaintiff will adequately and fairly represent the interest of the Company in enforcing and prosecuting its rights.

55. Plaintiff is and has continuously been an owner of the Company stock throughout the wrongful conduct alleged herein.

56. Plaintiff did not make demand on the Board of Directors of the Company to bring this action on behalf of the Company because such a demand would have been a futile, wasteful and useless act for the following reasons:

15

(a)     Between 1998 and 2001, defendant Fishman was the recipient of the stock options, which the Company admitted were back-dated. Because Fishman received a personal financial benefit from the challenged transactions, he is interested and demand upon him is futile;

(b)     Between 1998 and 1999 Defendant Stata was the recipient of the stock options, which the Company admitted were back-dated. Because Stata received a personal financial benefit from the challenged transactions, he is interested and demand upon him is futile;

(c)     All of the Director Defendants authorized, approved, ratified or have failed to rectify some or all of the back-dated stock option grants at issue here and are named as defendants herein.

(d)     The Board of Directors was at all relevant times responsible for overseeing the Company's compensation and stock option plans. The Board of Directors was also required to approve all stock option grants. The Board of Directors enabled, or through conscious abdication of duty, permitted the Company to back-date stock options issued to Defendant Stata and the Management Defendants. By such actions, Defendants breached their fiduciary duties to the Company. The back-dating of stock options was in direct violation of the stock option plans;

(e)     The back-dating of options as alleged herein was unlawful and not within Defendants' business judgment to acquire, authorize, ratify or facilitate;

(f)     There was no basis or justification for back-dating the stock options. It was designed solely to benefit Defendant Stata and the Management Defendants in a manner that was inconsistent with the Company's stock option plans, and the Company's public disclosures,

16

to the detriment of the Company. Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the Defendants;

(g)     All of the Defendants authorized the filing of Proxy Statements, in support of their nomination as Directors, which failed to disclose that Defendant Stata and the Management Director's stock options had been back-dated. They also authorized the filing of shareholder approved stock option plans and employment agreements, which misrepresented that the options carry the stock price of the day of the award. Any suit by the Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(h)     All of the Defendants signed the Company's Annual Reports on Form 10-K between 1998 and 2001, which contained the Company's financial statements, which failed to account for the back-dated stock options as compensation and an expense of the Company. As a result, those financial statements of the Company may have overstated its profits and may need to be restated. Any suit by the Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action;

(i)     All of the Defendants participated in, approved, or through abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company stockholders and/or acting with negligence and

17

gross negligence disregarded the wrongs complained of herein, and therefore are not disinterested parties;

(j)     On information and belief, Defendants are protected against liability for breaches of fiduciary duty alleged in the Complaint by directors' and officers' liability insurance policies. As a result, if Defendants were to cause the Company to sue itself or certain officers of Analog, there would be no directors' and officers' insurance protection. This is yet another reason why Defendants are hopelessly conflicted in making any independent determination that would cause the Company to bring this action.

(k)     Despite Defendants' breaches of duty, the Board of Directors did not recommend that any Defendant be relieved of his or her duties as director. By maintaining the *status quo* in light of these breaches of duty, the entire Board failed to exercise proper business judgment and therefore lacks independence.

(l)     Most egregiously, the Board of Directors did not require Defendant Stata and the Management Defendants  to immediately disgorge all of their ill-gotten gains from their improper manipulation of their stock option grants and other misconduct, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company. Nor did they take any other action, including commencing legal proceedings, to protect the interests of the Company.

## COUNT I

### Against All Defendants For Violations of Section 14(a) of the Exchange Act

57.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

18

53. Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading statements to shareholders which were contained in the Company's Definitive Proxies filed on February 8, 2002, and February 7, 2003, which each misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reasons of the conduct alleged herein, each Director Defendant violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a). The information would have been material to the Company's shareholders in determining whether to elect directors to manage their company.

53. Plaintiff, on behalf of the Company, thereby seeks to void the election of Director Defendants based upon the misleading and incomplete proxy materials, and to recover damages caused by Defendants' failure to disclose the improper compensation described herein.

## COUNT II

## Against All Defendants for Breach of Fiduciary Duty

60. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

61. The Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

62. The Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

63. Each of the Defendants authorized, or by abdication of duty, permitted the stock options granted to Defendant Stata and the Management Defendants to be back-dated. These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

19

64. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good will.

65. The Company has been directly and substantially injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of the Company, seeks damages and other rel ef for the Company, in an amount to be proven at trial.

## COUNT III

### Against All Defendants for Gross Mismanagement

66. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

67. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

68. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages in the millions of dollars.

69. As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

## COUNT IV

### Against Defendants For Waste Of Corporate Assets

70. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

20

71.     By engaging in the wrongdoing alleged herein, Defendants wasted corporate assets by, among other things, improperly granting stock option grants, improperly manipulating stock options, failing to recover improperly secured profits, damaging the goodwill and reputation of the Company, and exposing the company to civil and criminal liability, for which they are liable.

72.     As a direct and proximate result of Defendants' wrongful conduct, the Company has suffered damages in an amount to be proven at trial.

## COUNT V

### Against Defendant Stata and The Management Defendants for
### Unjust Enrichment and Breach of the Duty of Loyalty

73.     Plaintiff incorporates by reference all paragraphs above as if set forth herein.

74.     As a result of the back-dating of the options granted to them, Defendant Stata and the Management Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

75.     Accordingly, this Court should order Defendant Stata and the Management Defendants to disgorge all profits, benefits and other compensation obtained by the Management Defendants, and each of them, from their wrongful conduct and fiduciary breaches described herein, and should order the options held by the Management Defendants, which have not yet been exercised, to be repriced at the market price of the Company's stock on the dates the Court finds that those options were actually, in fact, granted.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including declaring the improper compensation awards complained of herein to be null and void; and attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of the Company have an effective remedy;

C.    Awarding to the Company restitution from Defendant Stata, the Management Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendant Stata, the Management Defendants as a result of the conduct alleged herein;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 7, 2006                          Respectfully submitted,

**LAW OFFICE OF PETER A. LAGORIO**

By: Peter A. Lagorio (BBo 567379)
63 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 367-4200
Facsimile: (617) 227-3384

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Lawrence P. Kolker
Martin E. Restituyo
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

#442007

23

I, __L.A. MVRPHY__, declare that I am a shareholder of Analog Devices, Inc. common stock and have continuously so owned this common stock since __3 - 8 - 01__ . (__3000 SHARES__)

I have reviewed the foregoing Verified Derivative Action Complaint, and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of perjury under the laws of the United States.

Dated: June 7, 2006

/441871

Account Workbook —
Open Holdings

Account

**Account Information**

LOU ANN MURPHY

**Details**

CSI
MSI
DSI

4C-Street Name-Hold/Hold All Funds
4C-Street Name-Hold/Hold All Funds
1-Dividends Directed Into
Free Credit Balance

CMA Type
Investment Objective
Risk Tolerance

6-Growth and Speculation
3-Aggressive)

**Balances**

N

**Contact Information**
Home Phone

| Quantity Held | Name | Symbol | Scan Date | Mkt Price | Unit Cost | Cost Acquired | Unrealized | Term |
|---|---|---|---|---|---|---|---|---|
| 3,000 | ANALOG DEVICES INC | ADI | 03/08/2001 | 38.3500 | 7.6650 | 210,000.00 | -95,030.00 | Long |